**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ERIC CHARLES NENNO, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-02-4907 |
| | § | |
| DOUG DRETKE, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case is before the Court on Petitioner Eric Charles Nenno's Petition for Writ of Habeas Corpus (Document No. 26), and Respondent Doug Dretke's Motion for Summary Judgment (Document No. 32). Having carefully considered the Petition, the Summary Judgment Motion, and the arguments and authorities submitted by counsel, the Court is of the opinion that Respondent's Motion for Summary Judgment should be GRANTED, and Nenno's Petition for Writ of Habeas Corpus should be DENIED.

I. <u>Background</u>

Petitioner, Eric Charles Nenno, currently in the custody of the Texas Department of Criminal Justice, filed this federal habeas corpus petition pursuant to 28 U.S.C. § 2254. Because this is

Nenno's first petition for federal habeas relief, a brief history of the case is appropriate.

Nenno was convicted of capital murder for raping and choking to death seven-year-old Nicole Benton.  On the evening of March 23, 1995, Nicole was playing with some other children in the front yard of Viola Jackson's house in Hockley, Texas.  Jackson was going in and out of the house, loading a motor home for a trip.  On one of Jackson's trips to the motor home, she noticed that Nicole was no longer in the yard.  After checking the yard, motor home, and house for Nicole, Jackson told Nicole's father that she was missing.  The police arrived about 20 minutes later.  Police and neighbors spent the next two days searching for Nicole.  19 Tr. at 43-54, 76-77.[1]

A tip directed police to Nenno.  After two unsuccessful attempts to contact Nenno, detectives found him at home.  They explained the purpose of their visit, Nenno invited them in, and they visited with Nenno for approximately 10 minutes.  As the detectives asked Nenno about Nicole, Nenno appeared very nervous. They asked Nenno if he would be willing to come to a trailer that police set up as a neighborhood command post and Nenno agreed to do so.  The police then returned to the command post and five to ten minutes later Nenno separately arrived at the command post. Detective Tabor read to Nenno his <u>Miranda</u> rights, asked if he understood them, which he said he did, and then Detective Tabor

---

[1] "Tr." refers to the transcript of Nenno's trial.

asked Nenno if he wanted to waive his rights and talk about the missing child, which Nenno agreed to do.  When Nenno was eventually asked what he thought happened to Nicole, Nenno responded that he thought she was kidnaped, raped, and murdered.  When asked what kind of person would do something like that, Nenno responded that it would be someone like him.  Id. at 93-120.  Detective Tabor asked Nenno if he would take a polygraph examination, to which he willingly agreed.

Lt. Raney, a licensed polygraph examiner, met Nenno at the command post later that evening.  Lt. Raney told Nenno that he would know whether or not Nenno was telling the truth when the examination was finished.  Nenno contends that Lt. Raney also told him that the results could be used "for his benefit as well as for the benefit of the [police]."  Lt. Raney told Nenno that he had the right to refuse a polygraph, but Nenno was willing to proceed and signed the standard Texas Polygraph Examination Release Form before undergoing the test.  Nenno was not in custody, never indicated that he wanted to leave the interview, and if he had, Lt. Raney would have allowed him to leave.  At the conclusion of the test, Lt. Raney remained silent for six or seven minutes, at which point Nenno said, "I failed it, didn't I?"  Lt. Raney confirmed he "had some difficulty on it."  Lt. Raney told Nenno that he needed to tell where the girl was, and Nenno said, "I think she's still in the attic."

Nenno executed a second written consent to a search of his home,[2] accompanied officers to his home, and directed police to Nicole's body in the attic of his house.  Nicole was nude and lying on her back.  Police took Nenno back to the command post, re-read him his <u>Miranda</u> rights, and again interviewed him.  Nenno then gave a written statement.

Nenno admitted having sexual fantasies involving young girls for most of his life.  On March 23, 1995, Nenno picked up a six-pack of beer on his way home from work.  He chatted with a neighbor and drank all six beers.  He heard a band practicing and went outside, where he saw Nicole and the other children playing.  Nenno told Nicole that he thought the band sounded good, and she replied that her father played in the band.  Nenno said he wanted to get his guitar and go play with the band, and asked Nicole to come with him to get the guitar.  Nenno and Nicole entered the house.  Nenno picked Nicole up and carried her to the bedroom over her objections.  Nicole cried while Nenno undressed her.  He tried to have intercourse with her but Nicole was too small.  Nicole was crying and Nenno placed his hand over her mouth.  She began fighting back, and Nenno put his left arm around her neck from behind.  He choked Nicole to keep her quiet.  He dragged her into the bathroom, where she eventually stopped struggling.  Nenno

---

[2] Nenno had signed a previous consent that day, but the investigating officers found nothing of interest.

4

believed she was dead.  He then raped her vaginally and, a short
while later, orally.  After cleaning up Nicole's body, Nenno saw
that people were out looking for her.  He carried the body up to
the attic to hide it, and placed Nicole's clothes in his file
cabinet.  Id. at 59-62, 121-67, 191-98.

An autopsy supported a finding of death by asphyxia due to
strangulation.  Injuries to the head and face supported Nenno's
statement that he placed his arm around Nicole's neck and choked
her.  Injuries to Nicole's genital region supported Nenno's
confession of attempted rape while Nicole was alive, and rape after
she died.  20 Tr. at 211-33.  Police found Nicole's clothes in
Nenno's file cabinet.  Fibers from Nenno's clothes were under
Nicole's fingernails, and samples of Nicole's hair were on Nenno's
carpet.  Id. at 248-314.

Nine-year-old Crystal Townsend testified at the penalty phase
that, when she was seven years old, her bicycle broke near Nenno's
house.  Nenno fixed Crystal's bicycle and then "touched me on my
butt."  Crystal then ran away.  22 Tr. at 49-56.

Detective William Taber testified that Nenno told him about a
recurring sexual fantasy involving the ten-year-old daughter of his
ex-girlfriend.  Nenno also admitted masturbating while watching
children play in his neighborhood.  Id. at 60-65.

The State also presented expert testimony by Kenneth Lanning,
a Supervisory Special Agent in the Behavioral Science unit of the

FBI.  Lanning specializes in studying the sexual victimization of children.  From information given about Nenno, Lanning concluded that Nenno is a pedophile.  Lanning testified that such a person is difficult to rehabilitate.  After receiving a lengthy hypothetical matching the facts shown by the evidence, Lanning testified that an individual matching the hypothetical "would be an extreme threat to society and especially children within his age preference." Id. at 101-24.  Nicole's grandmother testified on the impact of Nicole's death on her family, including Nicole's three-year-old brother. Id. at 139-42.

The defense presented evidence that Nenno was under the influence of alcohol and marijuana before his arrest, was classified for a low level of supervision in jail, and that he did not engage in any  violent conduct while in jail.  He also held a job and received good employee reviews before his arrest.  Id. at 152-70.

Nenno's uncle, Clarence Johnson, testified on Nenno's behalf. Nenno worked for Johnson for more than eight years and was an excellent employee.  Nenno was devoted to his mother and helped care for her.  Johnson was shocked when he heard that Nenno was charged with capital murder because he never saw any violent tendencies in Nenno.  Id. at 172-76.  Nenno's sister testified that Nenno was close with his family, was nonviolent, and served honorably in the United States Navy.  23 Tr. at 182-98.

6

Dr. Robert Geffner, a neuropsychologist, testified that, based on his testing of Nenno, Nenno has no significant personality disorder, but is a non-exclusive, non-preferential pedophile.  This means a person who prefers sexual interaction with adults, but could have sexual relations with a child.  Nenno's sexual interests are exclusively heterosexual.  He is generally nonviolent.  Testing also revealed abnormality in the frontal and temporal lobes of Nenno's brain.  Dr. Geffner explained that the frontal lobes are the control center of the brain, and include impulse control.  Frontal lobe damage combined with alcohol or marijuana use can reduce inhibitions and produce aggressive and violent behavior.  Nenno is unlikely to be violent if he is in a structured environment, lacks access to alcohol, and participates in a treatment program for sex offenders.  Dr. Geffner also opined that Kenneth Lanning's theories are not generally accepted within the medical and scientific communities.  On cross-examination, Dr. Geffner conceded that it is very difficult accurately to predict future dangerousness.  <u>Id</u>. at 207-43, 265-302.

The jury found that Nenno posed a future danger to society and that the mitigating evidence was not sufficient to justify imposing a life sentence.  The trial court therefore imposed a sentence of death.  25 Tr. at 434-35.

The Texas Court of Criminal Appeals affirmed Nenno's conviction and sentence, <u>Nenno v. State</u>, 970 S.W.2d 549 (Tex. Crim.

App. 1998), and denied his original application for a writ of habeas corpus, Ex Parte Nenno, No. 50,598-01 (Tex. Crim. App. Nov. 14, 2001).  Nenno filed his original federal petition for habeas corpus on October 18, 2002, and amended the petition on December 20, 2002.  On January 12, 2004, this Court dismissed Nenno's amended petition without prejudice to allow Nenno to exhaust a claim in state court.  Nenno filed a successive state petition, which the Texas Court of Criminal Appeals dismissed as an abuse of the writ on June 23, 2004.  Ex Parte Nenno, No. 50,598-02 (Tex. Crim. App. June 23, 2004).  Nenno filed his current federal petition on August 20, 2004, and Dretke moved for summary judgment on June 30, 2005.  In accordance with the equitable tolling granted to allow Nenno to return to state court, Nenno's petition is timely.

## II.  Discussion

### A.   The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective April 24, 1996.  *See* Lindh v. Murphy, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Kitchens v. Johnson, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." See Martin v. Cain, 246 F.3d 471, 475 (5th Cir.), cert. denied, 534 U.S. 885 (2001).  Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'"  Dowthitt v. Johnson, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting Williams v. Taylor, 529 U.S. 362, 406 (2000)), cert. denied, 532 U.S. 915 (2001).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends

9

a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Williams</u>, 529 U.S. at 406.  "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." <u>Hoover v. Johnson</u>, 193 F.3d 366, 368 (5th Cir. 1999).  A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." <u>Neal v. Puckett</u>, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom*. <u>Neal v. Epps</u>, 537 U.S. 1104 (2003).  The solitary inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'"  <u>Id</u>. (quoting <u>Hennon v. Cooper</u>, 109 F.3d 330, 335 (7th Cir. 1997)); *see also* <u>Gardner v. Johnson</u>, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be

10

'unreasonable.'"").  The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also* <u>Jackson v. Anderson</u>, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

B.    <u>The Standard for Summary Judgment in Habeas Corpus Cases</u>

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  <u>Clark v. Johnson</u>, 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000).  Insofar as they are consistent with established habeas practice and procedure, the Federal Rules of Civil Procedure apply to habeas cases.  *See* Rule 11 of the Rules Governing Section 2254 Cases.  In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the non-moving party.  *See* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in

11

his favor"). However where a state prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. Marshall v. Lonberger, 459 U.S. 422, 432 (1983); Sumner v. Mata, 449 U.S. 539, 547 (1981); May v. Collins, 955 F.2d 299, 310 (5th Cir. 1991), *cert. denied*, 504 U.S. 901 (1992); Emery v. Johnson, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998). Consequently, where facts have been determined by the Texas state courts, this Court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

C.   Summary Judgment in the Instant Case

Nenno's petition raises eight claims for relief. These are addressed in turn.

1.   Nenno's Confession

Nenno contends that police manipulated him into making his first admission that he killed Nicole, which came after he submitted to a polygraph examination. The trial court granted a pretrial motion to suppress these statements. 4 Tr. at 275.

After making the suppressed statements, Nenno consented to a search of his home. He directed police to Nicole's body and subsequently gave a written confession. Nenno now contends that the consent to search and written confession were the fruit of his tainted initial statement.

The Fifth Amendment protects a defendant against compelled self-incrimination. *See* <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Under the fruit of the poisonous tree doctrine, evidence derived from illegally obtained statements must also be suppressed. <u>Wong Sun v. United States</u>, 371 U.S. 471, 484 (1963).

a. <u>Procedural Default</u>

Dretke argues that this claim is unexhausted. AEDPA requires that a prisoner exhaust his available state remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process, or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). As the Fifth Circuit explained in a pre-AEDPA case, federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all

13

grounds for relief, as well as factual allegations supporting those grounds. "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." Orman v. Cain, 228 F.3d 616, 619-20 (5th Cir. 2000); *see* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").

In his direct appeal, Nenno argued that the statements he made at the police command center were the involuntary results of a custodial interrogation, and that his statements were made in response to police coercion. The Court of Criminal Appeals noted that Nenno went to the police command center voluntarily and rejected Nenno's claim that he was in custody and, as well, rejected his claim that he was coerced. Nenno v. State, 970 S.W.2d 549, 556-57 (Tex.Crim.App. 1998).

Nenno also argued that:

> To the extent that this assurance is indis-
> tinguishable from a police officer's comment
> that a suspect's confession could be used "for
> or against him," or "for and against him,"
> [the polygraph examiner]'s statement compels
> the conclusion that [Nenno]'s statements that
> were clearly the product of the polygraph test
> were involuntary as a matter of law. *See,*
> *e.g.*, Dunn v. State, 721 S.W.2d 325, 341-42
> (Tex.Crim.App. 1986) . . . .

14

App. Br. at 102.   It therefore appears that Nenno did argue on direct appeal that his subsequent statements were tainted by what he contended was the prior coercive police interview in conjunction with the polygraph examination.   It therefore appears that Nenno exhausted this claim.

      b.   <u>Tainted Statements</u>

Nenno nonetheless is not entitled to relief on this claim.  As noted above, Nenno raised a substantially similar claim in his direct appeal.   The Texas Court of Criminal Appeals rejected the claim, finding that Nenno voluntarily submitted to the polygraph examination, was not in custody at the time of the examination, and that his statements were not the result of coercion.

> [N]othing in the record suggests that [Nenno] made any statements during the polygraph examination that he had not already made during interviews.   Only after the examination, while the polygraph examiner remained silent, did [Nenno] blurt out that he had "failed" the test.   That admission was not in response to interrogation and [Nenno] must have realized that it would not be used to benefit him.   Furthermore, it was made after the conclusion of the test, which was the only subject of the "for or against" warning.
>
> As for the comment that [Nenno] would "have" to tell the police the location of the body, Lt. Raney did not promise or threaten [Nenno] in any way when he made the statement. [Nenno] was simply confronted with the fact that the authorities knew he was guilty.   Lt. Raney may have inflated the significance of the polygraph results by telling [Nenno] that

he would know whether [Nenno] was guilty after
the test.  But inflated evidence of guilt is
the tactic least likely to render a confession
involuntary.  <u>Green v. State</u>, 934 S.W.2d 92,
100 (Tex.Crim.App. 1996), *cert. denied*, 520
U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707
(1997).   The use of such a tactic, which
capitalizes on an accused's "moral sense of
right and wrong, and his judgment regarding
the likelihood that the police have garnered
enough valid evidence linking him to the
crime," does not cause the accused's will to
be overborne because it does not distort "an
otherwise rational choice of whether to
confess or remain silent."  <u>Id.</u>  Lt. Raney
simply used the discovery of [Nenno]'s guilt
as leverage to urge [Nenno] to reveal the
location of the body.  Such a tactic does not
deprive an accused of the ability to make a
free and rational choice on whether to remain
silent.  We conclude that the circumstances
present in this case do not show that
[Nenno]'s written statement was involuntary.

<u>Nenno v. State</u>, 970 S.W.2d 549, 558-59 (Tex.Crim.App. 1998).

Citing <u>Rhode Island v. Innis</u>, 446 U.S. 291 (1980), Nenno now

argues that the polygraph examiner's silence after the examination

was the functional equivalent of a custodial interrogation.  <u>Innis</u>

held that "the definition of interrogation . . . extend[s] . . . to

words or actions on the part of police officers that they *should*

*have known* were reasonably likely to elicit an incriminating

response.  <u>Id.</u> at 302.  Nenno's argument fails for two reasons:

First, as the Court of Criminal Appeals found, he was not in

custody.  Second, it simply tortures the English language to

contend that a few minutes of silence on the part of a police

officer, in a setting where Nenno was free to get up and leave, was--as Nenno puts it--"tantamount to coercive interrogation."

Based on the record, the Court finds that the Texas Court of Criminal Appeals reached a reasonable conclusion that the polygraph examination was not unlawful and that neither the polygraph nor Nenno's subsequent statements were the result of coercion. That decision is therefore entitled to deference under AEDPA, and forecloses relief on this claim.

### 2.   Testimony of Kenneth Lanning and Crystal Townsend

In his second claim for relief, Nenno argues that Kenneth Lanning's testimony violated his Eighth and Fourteenth Amendment rights because the testimony was not based on an individualized assessment of Nenno.   Rather, Lanning testified based on a hypothetical drawn from the facts in evidence that Nenno fit a particular criminal profile based on Nenno's statements to police and the circumstances of the crime.   Nenno raised a similar claim in his direct appeal, but argued only that Lanning's testimony violated the Texas rules of evidence; he made no federal constitutional argument.

In his fifth claim for relief, Nenno argues that the penalty phase testimony of Crystal Townsend appealed to the emotions and bias of the jurors in violation of the Eighth Amendment.   Dretke argues that this claim is unexhausted and procedurally defaulted.

Nenno concedes that he never expressly raised this federal constitutional claim in state court, but argues that he raised a claim based on a state rule of evidence and that the state rule is coextensive with federal constitutional requirements. This argument is unavailing.

A federal claim is not exhausted in state court unless the petitioner "fairly presented" the claim to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971). While Nenno is correct that he need not cite chapter and verse of the United States Constitution to exhaust a claim, he must at least put the state court on notice that claims of constitutional proportion are being raised so as to provide the state court an opportunity to remedy the alleged constitutional defect.

> Only if the state courts have had the first opportunity to hear the claim . . . does it make sense to speak of the exhaustion of state remedies. Accordingly, we have required a state prisoner to present the state courts with *the same claim* he urges upon the federal courts.

Id. (emphasis added). Here, Nenno merely argued that the trial court had erred in the application of certain state rules of evidence. He never argued that these purported errors in evidentiary rulings under state law had implicated his rights under the United States Constitution.

Nenno now argues that the state law basis of the claim is coextensive with his federal constitutional arguments.  Ordinarily, state evidentiary rulings do not implicate federal constitutional rights.  *See* Skillern v. Estelle, 720 F.2d 839, 852 (5th Cir. 1983), *cert. denied*, 469 U.S. 873 (1984) (a federal habeas court "do[es] not sit as a super state supreme court to review error under state law"); Bailey v. Procunier, 744 F.2d 1166, 1168 (5th Cir. 1984) (a federal court may grant habeas relief "only when the trial judge's error is so extreme that it constitutes a denial of fundamental fairness under the Due Process clause").  In state court, Nenno argued only that Lanning's testimony was scientifically unreliable, and that it was more prejudicial than probative; he never argued that the admission of the evidence rendered the trial fundamentally unfair.  Similarly, Nenno argued only that Crystal Townsend's testimony violated the Texas Rules of Evidence.  Because state evidence law does not ordinarily implicate federal constitutional rights, Nenno's state law arguments did not "fairly present" the federal constitutional claims he raises in this federal petition, *i.e.*, raising an issue of state evidence law did not bring to the attention of the Texas courts that Nenno either had or was making any federal constitutional claims.  As discussed above, Nenno's failure to raise a constitutional basis for these claims in state court renders the claims unexhausted and procedurally defaulted.

19

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims. Rose v. Lundy, 455 U.S. 509 (1982). Such a result in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law. On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground. Martin v. Maxey, 98 F.3d 844, 847 (5th Cir. 1996). A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred. Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances. Tex.CodeCrim.Proc.Ann. art. 11.071 § 5(a) (Vernon Supp. 2002). The Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or

20

> (2)  by a preponderance of the evidence, but
> for   a   violation   of   the   United   States
> Constitution  no  rational  juror  could  have
> found the applicant guilty beyond a reasonable
> doubt.

Id.  The Texas Court of Criminal Appeals applies its abuse of the
writ doctrine regularly and strictly.  Fearance v. Scott, 56 F.3d
633, 642 (5th Cir. 1995) (per curiam).

Petitioner does not claim that he could not have presented the
claims in his direct appeal or his state habeas petition because
the factual basis for the claims did not exist, or that he is
actually innocent.  Therefore, Petitioner's unexhausted claims do
not fit within the exceptions to the successive writ statute and
would be procedurally defaulted in the Texas courts.  Coleman, 501
U.S. at 735 n.1.  That bar precludes this Court from reviewing
Petitioner's claims absent a showing of cause for the default and
actual prejudice attributable to the default, or that this Court's
refusal to review the claims will result in a fundamental
miscarriage of justice.  Id. at 750.  Petitioner offers no showing
of cause for his failure to raise these claims in state court, nor
does he argue that this Court's refusal to consider the claims will
result in a fundamental miscarriage of justice.  Therefore, there
are no grounds to excuse Nenno's procedural default.

### 3.    Ineffective Assistance of Counsel

In his third, fourth, and eighth claims for relief, Nenno argues that his trial and appellate counsel rendered ineffective assistance by failing to object to Lanning's testimony, and failing to present evidence that Nenno suffered brain damage during his service in the United States Navy.  Nenno never raised these claims in state court.

Nenno responds that his default can be excused because, notwithstanding the provision of the Texas Code of Criminal Procedure that "[a death-sentenced] applicant shall be represented by competent counsel," the Texas Court of Criminal Appeals has held that the statutory entitlement to competent counsel "does not give a habeas applicant a constitutional or statutory right to effective assistance of that counsel."  Ex parte Graves, 70 S.W.3d 103, 117 (Tex.Crim.App. 2002).  This, according to Nenno, is "not rational." Hence, he argues, the Texas state postconviction procedures are themselves "ineffective to protect the rights of the applicant" under 28 U.S.C. § 2254(b)(1)(B)(ii).  Nenno's argument that it is the state habeas corpus *system*, and not state habeas *counsel*, that is ineffective, is without merit.[3]

---

[3] Nenno himself recognizes that the Fifth Circuit has twice rejected the argument he makes here, although he unconvincingly attempts to distinguish these cases.  *See* Beazley v. Johnson, 242 F.3d 248, 270-71 (5th Cir. 2001); Martinez v. Johnson, 255 F.3d 229, 238 n. 10 (5th Cir. 2001) ("[F]ailure to provide 'competent' counsel for a state habeas petition does not fall under the general

There is no question that Texas provides a postconviction procedure that allowed Nenno to raise his claims of ineffective assistance of appellate counsel.  Nenno's state habeas counsel did not do so.  The failure to raise this claim was thus counsel's failure, not the state habeas system's.  When Nenno's structured argument is distilled to its essence, it is simply this: Nenno complains that his state habeas counsel provided him with ineffective assistance.

It is well-established, however, that there is no constitutional right to counsel in a post-conviction proceeding. "States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." Pennsylvania v. Finley, 481 U.S. 551, 557 (1987) (citation omitted).  For this reason, Nenno has no constitutional right to effective assistance of postconviction counsel, id. at 557-58, and ineffective assistance of postconviction counsel cannot constitute cause for a procedural default.

> There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings . . . [Petitioner] must bear the risk of attorney error that results in a procedural default.

------------------------

catch-all exception provided in 28 U.S.C. § 2254(b)(1)(B)(ii).").

Coleman v. Thompson, 501 U.S. 722, 752-53 (1991) (citations and internal quotation marks omitted); *see also*, Martinez v. Johnson, 255 F.3d 229, 241 (5th Cir. 2001) ("ineffective assistance of habeas counsel cannot provide cause for a procedural default"), *cert. denied sub nom.* Martinez v. Cockrell, 534 U.S. 1163 (2002). Therefore, Nenno fails to demonstrate cause for his procedural default of these claims.

> 4.   Trial Court's Refusal To Inform the Jury On Parole Eligibility

In his sixth claim for relief, Nenno argues that the trial court's rejection of his request to *voir dire* concerning, and to instruct on, parole eligibility violated the equal protection clause of the Fourteenth Amendment because jurors in non-capital cases are informed about parole eligibility. Nenno concedes that he did not raise this claim in state court, but again argues that the ineffectiveness of his state habeas counsel rendered the state habeas process ineffective to protect his rights. For the reasons discussed above, this argument is unavailing, and Nenno fails to demonstrate cause for his procedural default of this claim. Nenno also concedes that Fifth Circuit precedent precludes this claim. For both of these reasons, Nenno is not entitled to relief on this claim.

5.   Ring v. Arizona

In his seventh claim for relief, Nenno argues that the Supreme Court's decisions in Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000), render the statutory special issues in his case invalid.  Nenno raised this claim in a successive state habeas application, which the Texas Court of Criminal Appeals dismissed as an abuse of the writ.  Dretke argues that this dismissal renders this claim procedurally defaulted. Nenno now concedes that Ring is not retroactively applicable and is to no avail in Nenno's case in light of Schriro v. Summerlin, 548 U.S. 348 (2004).  Therefore, even if not procedurally defaulted, Nenno is still not entitled to relief on this claim.

III.  Certificate of Appealability

Nenno has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA sua sponte.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.")  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA

until the district court has denied such a request. *See* <u>Whitehead v. Johnson</u>, 157 F.3d 384, 388 (5th Cir. 1998); *see also* <u>Hill v. Johnson</u>, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." <u>Lackey v. Johnson</u>, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* <u>United States v. Kimler</u>, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." <u>Hernandez v. Johnson</u>, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a

26

> habeas petition on procedural grounds without
> reaching the prisoner's underlying constitu-
> tional claim, a COA should issue when the
> prisoner shows, at least, that jurists of
> reason would find it debatable whether the
> petition states a valid claim of the denial of
> a constitutional right and that jurists of
> reason would find it debatable whether the
> district court was correct in its procedural
> ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000).  "The nature of the penalty in a capital case is a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'"  Washington v. Johnson, 90 F.3d 945, 949 (5th Cir. 1996), *cert. denied*, 520 U.S. 1122 (1997) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).  However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)."  Barrientes v. Johnson, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully and exhaustively considered each of Nenno's claims.  While the issues Nenno raises are clearly important and deserving of the closest scrutiny, the Court finds that each of the claims is foreclosed by clear, binding precedent. This Court concludes that under such precedents, Nenno has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As to those claims that have been

dismissed on procedural grounds, this Court concludes that jurists
of reason would not find it debatable whether the petition states
valid grounds for relief and would not find it debatable whether
this Court is correct in its procedural determinations.  This Court
concludes that Nenno is not entitled to a certificate of appeal-
ability on his claims.

IV.  <u>Order</u>

For the foregoing reasons, it is ORDERED as follows:

1.   Respondent Doug Dretke's Motion for Summary Judgment
     (Document No. 32) is GRANTED;

2.   Petitioner Eric Charles Nenno's Petition for Writ of
     Habeas Corpus (Document No. 26) is in all respects
     DENIED, and Nenno's Petition is DISMISSED WITH PREJUDICE;

3.   No Certificate of Appealability shall issue in this case.

The Clerk shall notify all parties and provide them with a
true copy of this Order.

SIGNED at Houston, Texas, on this 7th day of March, 2006.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE